**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**UNITED STATES OF AMERICA,**

                                        **Plaintiff,**

            **vs.**                                     **8:07-CR-200**
                                                              **(GLS)**

**DANNY THERIAULT,**

                                        **Defendant.**
_____

**APPEARANCES:**                        **OF COUNSEL:**

**FOR THE UNITED STATES:**

Hon. Glenn T. Suddaby            CARL G. EURENIUS
United States Attorney           Assistant U.S. Attorney
100 South Clinton Street
Syracuse, New York 13261-0663

**FOR DANNY THERIAULT:**

Office of William J. Gray        WILLIAM J. GRAY, ESQ.
112 State Street
Albany, New York 12207

**Gary L. Sharpe**
**District Court Judge**

                        <u>**Decision and Order**</u>

**I.**      <u>**Introduction**</u>

        Danny Theriault has been charged with marijuana distribution and

importation conspiracies.  *See Indictment, Dkt. No. 1; see also* 21 U.S.C.

§§ 846, 963.  Claiming violations of his Fifth and Sixth Amendment rights,

he moves to suppress oral statements he made to police officers.  *See Dkt.*

*Nos. 74, 76-77*; *see also* FED. R. CRIM. P. 12(b).  For the reasons that

follow, his motion is denied.

## II.  <u>Facts</u>

Having considered Theriault's burden of production, the appropriate

burden of proof, the testimony of Drug Enforcement Administration ("DEA")

Special Agent Merkel, New York State Police Investigator Snell, New York

State Trooper Levin and Theriault, the suppression hearing exhibits, the

parties' submissions, records contained in the court docket,[1] and having

resolved issues of credibility, the court finds the following essential facts.

*See* FED. R. CRIM. P. 12(d); *see also United States v. Miller*, 382 F. Supp.

2d 350, 361-63 (N.D.N.Y. 2005) (burden of production and proof).

For more than a decade, law enforcement authorities received

information that Theriault and his mother, Jackaleen, were involved with

others in the wide-scale distribution of marijuana.  *See 4/21/07 Merkel*

---

[1]While the court may reference documents in the underlying record to make factual findings pertinent to suppression issues, such findings are typically constrained by evidence offered at a hearing.  When a defendant satisfies his burden of production, the government bears the burden of proof.  The government should not presume that the court will scour the docket to locate relevant facts.

*Search Warrant Affidavit at ¶ 5, Dkt. No. 45 ("Merkel Aff.").*  After police gathered additional evidence of Theriault's narcotics activity from state-authorized wiretaps and other investigative measures, that evidence was presented to a federal grand jury which returned a sealed indictment on April 19, 2007.  *See Dkt. Nos. 1-3*; *see also Merkel Aff.*  A sealed warrant for Theriault's arrest was issued when the indictment was filed.  *See id.*

On April 21, Merkel obtained a federal search warrant for Theriault's North Bangor, New York residence.  *See Merkel Aff.; see also 4/21/07 Search Warrant, Dkt. No. 47* (*"Search Warrant"*).  Merkel informed the issuing judge that Theriault had previously been convicted of violent crimes and a drug felony, and that he had expressed a penchant for violence during intercepted wiretap conversations.  *See Merkel Aff. at ¶ 5.*  Merkel also established reason to believe that Theriault might be armed.  *See id. at ¶ 2h.*  Accordingly, the judge authorized a no-knock warrant, *inter alia*, in order to protect the safety of the executing officers.  *See Search Warrant at p. 1.*  During the suppression hearing, Theriault admitted that he had been previously arrested nineteen times, ten for felonies and two for violent felonies.  *See 1/8/08 Suppression Hearing Transcript at 91, Dkt. No. 85*

*("Hrg. T.")*.[2]

On April 24, the police executed the arrest and search warrants at Theriault's residence.[3]  Because Theriault was considered armed and dangerous, the executing officers were accompanied by the New York State Police Mobile Response Team ("MRT").  Using a battering ram and carrying a ballistics shield, Trooper Levin and nine other MRT members made an unannounced entry into the Theriault home at 6:15 A.M.  The MRT members were dressed in black clothing, and wore hoods, goggles and a helmet.  They carried arms at the ready, and immediately yelled that they were police officers.  Within seconds, they located Theriault, his girlfriend and a baby in a bedroom.  Theriault was removed to the living room, placed on the floor and his hands were secured behind his back by the equivalent of handcuffs.  Once Theriault was secured, the officers holstered their handguns, and those carrying long arms used slings to shoulder the weapons.  At no time did Levin or any MRT member holler at

_____

[2]In its supplemental brief, the government detailed Theriault's serious and violent arrest record.  *See 1/22/08 Supplemental Brief at p. 5 n.4, Dkt. No. 86.*  It suggests that the court may consider the details of that record because Theriault's rap sheet was provided to defense counsel in discovery and because it is available for the court's review.  *See id.*  While defense counsel may have a copy and it may be available, it is not a part of the court's docket nor was it offered in evidence at the suppression hearing.  *See e.g.*, fn. 1, *supra.*

[3]Theriault's arrest and the search of his residence were part of the simultaneous arrests of six others and two additional searches, all at other locations.

Theriault, or otherwise make demands regarding the location of weapons, drugs or money.  Within fifteen minutes, the house was secured and the MRT team left the house and property.

Merkel and Snell then entered and approached Theriault who was still on the living room floor.  Merkel allowed Theriault to stand, and explained that the arrest was authorized by warrant, and that the police also had a search warrant.  While Merkel and Snell were armed, their weapons were holstered.  When Merkel told Theriault why the police were there, Theriault spontaneously stated that he had a baby, he did not want to go to jail, and he wanted to do whatever he could to get out of his problem.  Merkel then removed Theriault to a patio area outside while the police completed a weapons search inside.  Because it was chilly, Merkel got Theriault a jacket.  Within minutes, the weapons search was completed and Theriault was returned to the kitchen area where he sat on a stool.

While on the patio and in the kitchen, Theriault spontaneously tried to initiate a conversation about cooperation.  Merkel advised him to slow down, and told Theriault that he could not talk to him without first reading him his *Miranda* rights.  While in the kitchen, Merkel utilized a preprinted DEA card and read the *Miranda* warnings verbatim.  The substance of the

advice was in full compliance with *Miranda*, including specific advice regarding Theriault's right to counsel during questioning and his right to appointed counsel if he could not afford one.  At the end of the *Miranda* advice, Merkel asked:  "Do you understand and are you willing to answer some questions?"  Theriault responded that he understood his rights and wanted to talk.

Theriault remained at the residence with Merkel and Snell for the next forty-five minutes, and freely spoke to them about his narcotics activity, including the location of marijuana and money in the residence and in a vehicle.  He answered their questions and spontaneously offered information.

After the forty-five minute interval at the residence, Theriault was transported to the State Police barracks in Malone, New York by Snell and a uniformed Trooper.  The trip took fifteen minutes, and Snell and Theriault continued to talk about Theriault's criminal activity.

At the station, Theriault was placed in an interview room.  After a brief hiatus while other defendants were processed, Snell resumed the conversation.  Again, Theriault was forthcoming about his activity although he declined to discuss the involvement of his mother and brother.  The

conversation terminated at approximately 9:30 A.M.  Accordingly, all questions, answers and spontaneous statements occurred in three separate locations within a span of approximately three hours and fifteen minutes.

Whether at the house, in the Troop car or at the station, Theriault remained cooperative throughout his conversations.  While he was initially agitated during the MRT entry, he was calm during his conversations with Merkel and Snell.  He remained willing to speak, he never requested an attorney, and he never demonstrated by word or deed any physical or mental impairment suggesting that he was incapable of making rational and voluntary decisions.  He never mentioned any childhood seizures or other disorders.  No police officer threatened him or made promises of any kind in order to induce him to waive his *Miranda* rights, waive his Sixth Amendment right to counsel, or otherwise speak.

Theriault testified at the suppression hearing, and submitted an affidavit in support of his suppression motion.  *See Hrg. T. 87-103; 11/13/07 Theriault Affidavit, Dkt. No. 77*.  During the hearing, he admitted that he knew it was the police who entered his home because they announced their presence.  However, he denied that he was provided

7

*Miranda* warnings until he was fingerprinted at the barracks, following

which further questioning ceased.  He further testified that he then told the

police that he wanted a lawyer.  He admitted that he had been arrested on

nineteen prior occasions and was fully conversant with his *Miranda* rights,

including his rights to remain silent and to an attorney.  Because he

understood his rights, he swore that he made no incriminating statements.

Nonetheless, he alternatively stated that any statements he did make were

the by-product of duress.  His duress claims were predicated solely on the

overwhelming show of police force at the time of his arrest and non-

*Mirandized* police questioning.[4]  Other than the details of MRT's forcible

entry, the court credits none of Theriault's other assertions, including those

alleging non-*Mirandized* police interrogation.

## III.  Analysis

Theriault argues that his statements must be suppressed because:

(1) they were elicited in the absence of counsel in violation of the Sixth

Amendment; (2) they were induced by custodial interrogation in the

absence of *Miranda* warnings and without an intelligent and voluntary

---

[4]In a legal memorandum, Theriault's attorney claimed that Theriault was incapable of voluntarily waiving his Fifth and Sixth Amendment rights because of a traumatic brain injury suffered when Theriault was six years old.  *See 11/9/07 Memorandum of Law, Dkt. No. 74.* There is no evidentiary support for that claim in Theriault's affidavit or in his suppression hearing testimony.  *See Theriault Aff., Dkt. No. 77; Hrg. T. 87-103.*

waiver of the rights encompassed by those warnings, in violation of the

Fifth Amendment's self-incrimination clause; and (3) they were involuntarily

induced in violation of the Fifth Amendment's due process clause.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the

accused shall enjoy the right ... to have the Assistance of Counsel for his

defence." U.S. CONST. amend. VI.  The right attaches at the initiation of

adversary judicial proceedings such as indictment, and extends to all

critical stages of a criminal prosecution, including post-indictment

interviews with the police.  *See Fellers v. United States*, 540 U.S. 519, 523

(2004); *United States v. Rommy*, 506 F.3d 108, 135 (2d Cir. 2007).  Unlike

the Fifth Amendment's *Miranda* jurisprudence which focuses on custodial

interrogation, the Sixth Amendment focuses on the intentional effort of the

police to obtain incriminating statements, or in other words, "deliberate

elicitation."  *See Fellers*, 540 U.S. at 524; *Rommy*, 506 F.3d at 135.

Deliberate elicitation occurs if the police stimulate the conversation, or take

some action designed to deliberately elicit incriminating remarks.  *See*

*Kuhlmann v. Wilson*, 477 U.S. 436, 459 (1986).  There is no deliberate

elicitation if the police passively listen, or if a suspect volunteers

statements.  *See id.* (passive listening); *Michigan v. Harvey*, 494 U.S. 344,

352 (1990) (volunteered statements).  The Sixth Amendment is not violated

if the police initiate contact, as long as they do not initiate statements.  *See Patterson v. Illinois*, 487 U.S. 285, 290-91 (1988).  Once the right to counsel attaches, deliberately elicited statements are inadmissible unless the defendant expressly waives the right.  *See Harvey*, 494 U.S. at 348; *Rommy*, 506 F.3d at 135-36.  A voluntary and knowledgeable *Miranda* waiver equally serves as a Sixth Amendment right to counsel waiver.  *See Patterson*, 487 U.S. at 292-93.

As for the Fifth Amendment and *Miranda*, there are typically three issues: whether *Miranda* warnings were necessary; if so were they adequate; and if so, did the defendant waive his rights.  *See United States v. McFarland*, 424 F. Supp. 2d 427, 434-35 (N.D.N.Y. 2006) (citation omitted).  The warnings are necessary if the defendant is subjected to custodial interrogation.  *See United States v. O'Brien*, 498 F. Supp. 2d 520, 533 (N.D.N.Y. 2007).  The warnings are adequate if the police warn the suspect "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires."  *Miranda v. Arizona*, 384 U.S. 436, 479 (1966); *accord Dickerson v. United States*, 530 U.S. 428, 433-44 (2000) (revisiting and affirming *Miranda*).

As the court has previously observed, the third inquiry - *Miranda* waiver - hinges on whether the rights were voluntarily, knowingly and intelligently waived, but that analysis significantly overlaps with the due process inquiry which focuses on whether the statements were coerced or voluntary.  *See McFarland*, 424 F. Supp. 2d at 433-36; *O'Brien*, 498 F. Supp. 2d at 533-34.  Thus, the subjects of the inquiry - rights versus statements - are different, but the legal standard and the factors to be evaluated are the same.  As to the *Miranda* waiver, the inquiry is two-fold: whether the defendant relinquished his rights because he made a free and deliberate choice to do so, or whether his choice was influenced by intimidation, coercion or deception; and whether the defendant was aware of the rights he was abandoning and the consequences of doing so.  *See McFarland*, 424 F. Supp. 2d at 435 (citations omitted).  On the other hand, the due process inquiry is whether the decision to speak reflected the defendant's free and unconstrained choice to do so, or whether his will succumbed to overbearing circumstances.  *Id.* at 436 (citing *Dickerson*, 530 U.S. at 434; *Green v. Scully*, 850 F.2d 894, 900 (2d Cir. 1988)).

In order to resolve these issues, the court must assess the totality of the circumstances surrounding the interaction of the police and the defendant, including the police conduct, the conditions of the waiver and

11

interrogation, and the characteristics of the accused.  *See O'Brien*, 498 F. Supp. 2d at 534 (citation omitted).  Police conduct includes physical abuse, psychological coercion, threats, and material misrepresentations, or affirmative acts of trickery or deceit.  *See id.*  Conditions of the waiver and interrogation include the existence of *Miranda* warnings themselves, the place of the waiver or interrogation, the duration and conditions of the interaction, the attitude of the police, and the presence of counsel. Characteristics of the accused include his experience, background, age, education, intelligence, and physical and mental state.  *See McFarland*, 424 F. Supp. 2d at 437.  No single factor is controlling.

Other legal principles are intertwined in the analysis.  Thus, an involuntary *Miranda* waiver creates a presumption of coercion which renders the subsequent statement inadmissible even though that statement might otherwise be voluntary.  *See McFarland*, 424 F. Supp. 2d at 434 (citation omitted).  By the same token, if the police comply with *Miranda's* requirements, a defendant is hard pressed to argue that the subsequent statement is coerced.  *Id.*

Given the court's factual findings, Theriault's statements are admissible because the government has satisfied its burden of proving that there were no Fifth or Sixth Amendment violations.  Since Theriault had

12

been indicted, a critical stage had been reached.  Therefore, his statements are admissible only if he waived his right to counsel before the police deliberately elicited the statements.  Furthermore, he was in custody when interrogated, and his subsequent statements are admissible only if he was first advised of his *Miranda* rights, he then voluntarily, knowledgeably and intelligently waived them, and he thereafter exercised his free and unconstrained choice to speak.

At 6:15 A.M., Theriault was confronted with an overwhelming show of authority accomplished by means of a forcible, armed entry.  While the average citizen might be traumatized by that experience, Theriault was not.  As he testified, he immediately knew it was the police because they announced their authority.  He had been arrested on nineteen prior occasions, and was no stranger to police confrontations or arrest procedures, including hand restraints.  Within fifteen minutes, the MRT left the house and property without any deliberate effort to elicit statements from Theriault.  When Merkel and Snell first approached Theriault in the living room, they explained their presence and the authority of the arrest and search warrants.  Neither Merkel nor Snell sought to deliberately elicit statements from Theriault by any means.  Although agitated by the arrest, Theriault completely understood his situation.  Within minutes, he

13

spontaneously began to speak about cooperation, and Merkel had to interrupt him in order to *Mirandize* him.

Utilizing a DEA *Miranda* card, Merkel fully apprized Theriault of his rights.[5]  As Theriault testified and given his extensive criminal record, he was fully conversant with his *Miranda* rights in any event.  When those rights were read to him, he acknowledged that he understood them and he affirmatively agreed to speak.  Thus, the advice was given, Theriault understood it, and he agreed to speak.  Furthermore, neither Merkel nor Snell did anything to deliberately elicit statements from Theriault prior to *Mirandizing* him.  Accordingly, if his *Miranda* waiver was voluntary, then he also validly waived his Sixth Amendment right to counsel.[6]

The remaining question is whether the police conduct, the conditions of the waiver and interrogation, and Theriault's characteristics - viewed in their entirety - reflect Theriault's voluntary choice to waive his rights and speak.  While the initial entry was stressful, no other factor suggests coercion.  After the MRT team left, all police firearms were holstered.

---

[5]The testimony of the police and Theriault is irreconcilable regarding the issuance of *Miranda* warnings.  The court concludes that Theriault committed perjury.

[6]Although the parties have not raised it, the court recognizes the *Elstad* issue unresolved in the Supreme Court's *Fellers* decision.  *See Fellers*, 540 U.S. at 525 and *Oregon v. Elstad*, 470 U.S. 298 (1985).  However, it is unnecessary to address the issue because the court has factually concluded that there was no intentional effort to deliberately elicit statements from Theriault before he was advised of his *Miranda* rights.

Theriault was given a warm jacket when he was outside.  Theriault offered

spontaneous information, and calmly and cooperatively answered

questions.  Theriault not only expressed a full understanding of his

constitutional rights, but he exercised his rights by declining to disclose

information about his mother and brother.  At no time throughout the

encounter did any police officer threaten him, deceive him or make any

promises to induce him to waive his rights or speak.  He never

demonstrated by words or actions that he did not comprehend his rights,

nor did he ever request counsel.  Lastly, the fact that Theriault's post-

*Miranda* statements followed an intelligent, knowledgeable and voluntary

waiver of those rights provides cogent evidence of the voluntariness of the

subsequent statements themselves.  Accordingly, there were no

constitutional violations and Theriault's statements are admissible.

## VI.  <u>Conclusion</u>

For the reasons recited herein, it is hereby

**ORDERED** that Theriault's motion to suppress statements (*Dkt. No.*

*74*) is **DENIED**; and it is further

**ORDERED** that the government is hereby granted permission to

renew its motion for a severance (*Dkt. Nos. 64, 66-67*) on or before **April**

**21, 2008**.

15

**SO ORDERED.**

Date:  April 7, 2008
Albany, New York

Gary L. Sharpe
U.S. District Judge